EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ ÁNGEL LLANOS GUERRA, acusado y apelante.

*Número:* CR-66-375     *Resuelto:* 28 de junio de 1968

*Edna Abruña Rodríguez, E. Armstrong de Watlington* y *Enrique Miranda Merced,* abogados del apelante; *J. B. Fernández Badillo, Procurador General,* e *Ida Cardona Hernández, Procuradora General Auxiliar,* abogados de El Pueblo.

SENTENCIA

En el proceso seguido contra el apelante por asesinato declaró el hijo de la víctima como testigo de cargo relatando la forma cómo fue muerto su padre. (¹) El fiscal

---

(¹) En el alegato del acusado se resume así el testimonio de este testigo:

"DECLARACIÓN DEL TESTIGO PEDRO JUAN RAMÍREZ—Vivía con su padre en la Calle Fajardo 287, en Villa Palmeras.

"Para el 28 de abril de 1965, de siete y media a ocho, estaba en el cuarto en que habitaba con su padre, en espera de que él terminara de preparar café, para él hacerle la comida, cuando entró el acusado. Que él se asombró y entonces éste le amenazó con una cuchilla que el testigo describió como de seis pulgadas de largo. Que le dijo que se callara que él iba a asaltar a su padre. Que el acusado agarró un tubo de los que tenían para la construcción y le dio con él a su padre. Que él entonces se le abalanzó encima; pero que como el individuo era más grande y fuerte que él, lo restralló y volvió y golpeó a su padre y entonces le rebuscó los bolsillos y le sacó el reloj y otros documentos. Que él trató de salir corriendo pero que se le enredó el ruedo del pantalón en la puerta y entonces el acusado lo amenazó con que si decía algo, lo mataba a él, a su hermana y a su novia. Que el acusado le advirtió que cuando viniera cualquier persona a preguntar por su papá, dijera que él había salido para la isla a ver a una hermana enferma. Que entonces él salió de la casa y se paró más abajo y allí estuvo como quince o veinte minutos y entonces vio que el acusado salió de la casa, pero sin su padre. Que entonces él regresó a la casa y no encontró a su padre y comenzó a buscarlo y no lo pudo encontrar, ni en la casa ni en los alrededores. Que entonces volvió a salir y el acusado volvió a amenazarlo. Que constantemente lo amenazaba.

"Que el 6 de mayo, su tía le ordenó que abriera la letrina y que al él hacerlo descubrió a su padre allí.

"Declaró que como dos meses o dos meses y medio después de la muerte de su padre, él estaba en el Hipódromo El Comandante, cuando se le acercó un individuo y le echó una carta al bolsillo. Que él la leyó y se la echó al bolsillo de la camisa. Que luego él le dio esa camisa a su novia para que se la lavara.

"Declaró que no fue hasta que descubrieron el cadáver de su padre que él contó lo sucedido, pues estaba aterrorizado con las amenazas que le habían hecho. ·

"En la repregunta declaró, que el mismo día de los hechos el acusado había estado en su casa y le había ofrecido para la venta, unas cosas; pero que su padre no compró nada, pues el dinero que tenía era para comprar un cemento.

"Que al otro día de ocurrido los hechos, o sea, el jueves 29, él salió de su casa como a las 9:00 de la mañana y vio al acusado frente a una Mueblería. Que el acusado volvió y lo amenazó. (T.E. p. 149) Que

presentó en evidencia una carta supuestamente escrita por el acusado. En ella confiesa el delito e incrimina a otra persona y está dirigida a "batata" y firma "Cheo". Se presentó prueba al efecto de que al acusado le dicen "Cheo".

detrás del acusado venía un hombre con un parcho y una gafas ahumadas. Que entonces el acusado le dijo que iban para el Banco Popular de Barrio Obrero. Que al llegar al Banco, el acusado sacó de su bolsillo, una libreta que era de su padre. Que tenía dos hojas firmadas para sacar dinero del Banco. Que una era por $125.00 y otra por $185.00. (T.E. p. 153) Que le entregó la de $125.00 para que él sacara ese dinero y que retiró el dinero y que cuando salió del Banco vino el acusado, le quitó el dinero y la libreta y todo y se lo guardó en el bolsillo izquierdo. Que luego el acusado y el acompañante se fueron en un taxi en dirección a Cantera. Que luego regresó a su casa pero no notificó a la Policía; que él estuvo en su cuarto hasta las siete de la noche en que fue a casa de su novia y luego regresó de nuevo a su casa.

"El viernes 30, salió de su casa como a las 9:00 ó 10:00 de la mañana en dirección hacia abajo y al llegar a la Calle Edna esquina Calle Fajardo, se encontró con el acusado, quien volvió nuevamente a amenazarle. Que luego de esto, fue a casa de su novia y no volvió para la casa. Que estuvo en la casa como hasta las seis y que cuando salió volvió a encontrar al acusado en la esquina. Que él entró a un Bar (Bar Lucerito de Abril) y que allí estuvo varios minutos. (T.E. p. 179) Que cuando salió, el acusado estaba en la Mueblería La Torre y que cruzó y fue donde él y volvió a amenazarle. Que luego él cogió un taxi y se fue a casa de su hermana, Isabel Ramírez de Castro, en Vistamar; pero que al llegar allá su hermana estaba disgustada con el esposo y no lo atendió y él se fue. (T.E. p. 182) Que como su hermana no lo quiso atender, él no le dijo nada a nadie. Que luego estuvo en casa de una vecina atendiendo una llamada que le hizo su hermana y vio televisión, regresando a su cuarto como a las 9:00 P.M.

"El sábado 1ro. estuvo por la mañana en casa de su novia. Que fue a visitar a la señora Borrero. Que ese día como a las 10:00 de la mañana, se encontró de nuevo al acusado y éste volvió a amenazarle. Que luego el acusado se fue y él se fue para la casa de doña María Coella. Allí conversó y luego fue hasta la casa de doña Andrea donde almorzó. Luego estuvo un rato en casa de su novia y regresó a su cuarto. Que ese sábado por la noche como a eso de las siete, se encontró nuevamente con el acusado y que éste volvió a amenazarlo. Que esa noche se acostó como a las 10:30.

"Que el domingo se levantó temprano y de diez a once de la mañana se encontró con el acusado y éste lo amenazó. Lo mismo sucedió esa tarde y esa noche.

"Que el lunes 3 de mayo, el acusado volvió a llevarlo al Banco. Que eso sucedió como a las diez y media más o menos. Que al llegar a la Plaza frente al Banco, le entregó un papel firmado para que le sacara dinero.

Para establecer que la letra del que escribió la carta era la del acusado se presentaron en evidencia dos documentos Identificación L, Exhibit XI (una muestra de la escritura del acusado, hecha por éste copiando lo que su abogado le dictaba de la carta firmada "Cheo"), y la Identificación O, Exhibit XIII (muestra de la letra del acusado suministrada al abogado del acusado por el padre de éste), así como el dictamen del perito calígrafo que determinó que los tres documentos habían sido escritos por la misma persona.

En apelación el único error que se apunta se relaciona con la admisión en evidencia de los documentos con Identifi-

---

Que él entró y firmó y le entregaron $185.00. El salió como a los diez minutos del Banco y le entregó el dinero al acusado.

"El martes se levantó como a las 10:30 de la mañana. Ese día él salió de la casa en dirección a una agencia hípica y al llegar al Bar 'Los Muchachos' vio al acusado frente a un bazar. Que el acusado lo pitó y en vista de que él no fue donde el acusado, éste vino hasta donde él. Que el acusado le entregó un papelito y le ordenó que le comprara creso. Que entró a la farmacia y compró medio peso de creso que era lo que decía el papelito. Que el acusado cogió el paquete y se fue en dirección a la Calle Tapia. Que volvió a su casa y luego estuvo en casa de doña Sixta Borrero. Que regresó a su casa y allí permaneció. Que esa noche sintió ruidos en el patio.

"El miércoles, vino su tía Carmen a preguntar por su padre y fueron al Cuartel. Ya había estado otra tía—Josefina—a verle. Ese día la Policía estuvo en la casa e inició una investigación en relación con la desaparición del padre, pero en esa ocasión él no dijo nada de lo que sucedía. Que esa misma tarde recibió una llamada telefónica y que identificó a la persona que llamaba como al acusado. Que en esa ocasión le llamó para preguntarle que hacía la policía en frente de su casa.

"El jueves volvió su tía Carmen, como a eso de las doce y media. Que él le manifestó a su tía que hacía como dos o tres días, percibía un mal olor; pero que él creía que eran ratones muertos. (T.E. p. 293) Que empezaron a buscar y abrieron la letrina y al golpear el cajón vio la pierna de su padre. Que entonces él perdió el conocimiento. Que de allí lo llevaron a casa de la novia donde lo atendieron de la exaltación nerviosa en que estaba.

"Que luego lo llevaron al Cuartel de la Policía de Barrio Obrero y luego al Cuartel General, donde lo interrogaron. Que luego él se entrevistó con su tía y luego de esta entrevista él expuso lo que sabía.

"Que fue con el detective Pizarro por el sector de Villa Palmeras y Lloréns Torres, tratando de localizar al acusado. Que estuvieron como dos o tres horas en la búsqueda. Que en la esquina de la Calle Río Grande y Edna estaba el acusado. Que entonces la Policía lo detuvo."

cación L y O a que se ha hecho referencia. Sostiene el apelante que fue errónea su admisión en evidencia ya que constituían material confidencial de la defensa. La cuestión surge así, según las versiones conflictivas enunciadas por el fiscal y la defensa.

Sostiene el fiscal que le informó al abogado del acusado que tenía en su poder una carta incriminatoria firmada por "Cheo" y le sugirió que le consiguiera muestras de la escritura del acusado para someterlas a un perito para que determinara si la carta había sido escrita por el acusado y si resultaba que no había sido escrita por éste eso le beneficiaba al acusado y lo podría usar en su defensa, pero que si por el contrario resultaba que la escritura era la misma, el fiscal presentaría la carta como prueba de cargo.

La versión de la defensa es en el sentido de que luego que se enteró de que el fiscal tenía la carta incriminatoria, la cual le fue facilitada por el fiscal para que la examinara, le informó a éste que el acusado negaba que hubiera escrito la carta pero que no estaba en condiciones de probar con un perito que la carta no había sido escrita por él ya que no tenía los medios económicos para contratarlo y que entonces el fiscal le ofreció que el perito de la policía le daría el servicio gratuitamente y por esa razón le suministró las muestras Identificadas L y O, pero no para que el dictamen del perito pudiera ser usado por el Pueblo si resultaba adverso al acusado.

Planteada así la cuestión la misma se reduce a dirimir un conflicto de hecho y el juez de instancia lo dirimió en contra del acusado dándole crédito a la versión del fiscal.

Se confirma la sentencia que dictó el Tribunal Superior, Sala de San Juan en 4 de octubre de 1965.

Así lo pronunció y manda el Tribunal y firma el Señor Juez Presidente. El Juez Asociado Señor Santana Becerra disintió en opinión separada en la cual concurre el Juez

Asociado Señor Hernández Matos. El Señor Juez Presidente no intervino.

(Fdo.) Luis Negrón Fernández
*Juez Presidente*

Certifico:

(Fdo.) Joaquín Berríos
*Secretario*

—O—

Opinión Disidente del Juez Asociado Señor Santana Becerra en la cual concurre el Juez Asociado Señor Hernández Matos

San Juan, Puerto Rico, 28 de junio de 1968

Entiendo que en este proceso y condena por asesinato en primer grado hubo en la Sala de instancia la absoluta negación de un juicio imparcial y justo. La prueba sobre el hecho en sí de la muerte, fue circunstancial.

Para sustanciar la anterior conclusión sobre ausencia de un juicio justo e imparcial, procedo a exponer los siguientes hechos según surgen del récord:

—1—

Declaró el testigo Pedro Juan Ramírez, hijo del interfecto, que algún tiempo después de la muerte de su padre se le apareció un "chamaco" mientras el testigo estaba en el Hipódromo El Comandante y le echó en el bolsillo una carta diciéndole que la leyera. Al testigo se le olvidó la carta y le dio la camisa a su novia Margarita Rodríguez para que la lavara. (T.E. págs. 85–86) La testigo Margarita Rodríguez declaró que vio la carta el 28 de mayo de 1965 en el bolsillo de la camisa que le llevó su novio Pedro Juan Ramírez. Avisó a una hermana del interfecto. (T.E. págs. 351–353) La hermana del interfecto Isabel Ramírez

declaró que en 28 de mayo de 1965 Margarita Rodríguez le entregó la referida carta y ella inmediatamente llamó al detective Pizarro a quien se la entregó al día siguiente. (T.E. págs. 355–358) El detective José Miguel Pizarro declaró que el 29 de mayo de 1965 Isabel Ramírez le dio la referida carta que él a su vez entregó al Fiscal Felipe Ortiz Ortiz. La carta fue llevada más tarde al laboratorio de la Policía. No precisó el momento exacto pero aseguró que entregó la carta al Fiscal Ortiz a principios de junio y en los primeros 3 ó 4 días. Pudo ser antes del 7 de junio. En esta fecha se celebró una vista preliminar. (T.E. págs. 372–380) El acusado había sido ya arrestado desde el día 7 de mayo de 1965. Esta carta se marcó *"Identificación H"* del Pueblo. (¹)

—2—

El Fiscal Eugenio Ramos Ortiz, quien llevaba el caso, sentó a declarar al testigo Mariano Caballero Pintor. El testigo se identificó como un guardia penal de la Penitenciaría del Estado quien custodiaba presos que eran conducidos a las cortes. La defensa hizo un planteamiento en torno a la materia sobre la cual declararía este testigo a base de

---

(¹) El texto de la "Identificación H" es el siguiente:

"Oye batata dile a tu brother bicho grande, que te ayude pues yo estoy preso y sin salvación, pues tu brother me dijo que matara al hijo también y yo no le hice caso pues dile a el que te ayude, si no yo hablo y lo acuso a el, porque mientras yo mataba al viejo cabron ese el me estaba esperando dentro de la letrina, fíjate batata si yo hubiera cogido los consejos de tu hermano, todo me hubiera salido bien, pues bicho grande me dijo que matara al hijo también y yo le dije que no era necesario y haora estoy arrepentido de no haberlo hecho pues tu hermano fue el que me ayudo a meterlo a la letrina, pues el tiene tanto delito como yo, pues el despúes que el hijo salio como imovil pues ese muchacho es el tenayer mas miedoso que yo he visto pues batata hoy lo que te voy a decir punto por punto, . . . oye ~~broth~~ [tachadura en el original] batata quema este papel. batata no te preocupes, que si todo sale bien, yo tengo un dinero guardado, y te lo voy a dar todo pues necesito que lo maten, pero que crean que el se suicidio. Ok viejo batata. Dale Rec. a toda mi panas. tu amigo que te aprecia (Fdo.) Cheo."

la naturaleza confidencial de la misma. Este planteamiento provocó un extenso debate (T.E. págs. 390–431) en ausencia del jurado. (²)

El testigo Caballero Pintor declaró que observó a tres pies de distancia la entrevista entre el Lic. Kolthoff, abogado de Asistencia Legal, y el acusado. Esta entrevista se realizaba en la oficina del alguacil adjunta a un depósito bajo rejas en donde sitúan a los acusados traídos al tribunal. Es en esta oficina, dijo el testigo, y debido a las precauciones de custodia, donde de ordinario ocurren esas entrevistas. El abogado pide permiso al alguacil o al guardia penal para que saque del depósito al acusado; el alguacil abre y después de esposarlo cuando fuere necesario, permite la entrevista en un escritorio que hay allí para esos actos. El testigo declaró que el local tendría unos 12 pies de ancho por 14 ó 16 de largo, con 4 escritorios y sus sillas donde trabajaban empleados de la oficina del alguacil y había la presencia de otras personas como el propio testigo guardia penal. Vio que el Lic. Kolthoff arrancó una hoja de una libreta y la entregó al acusado para que éste escribiera. El acusado escribió primero con un lápiz que estaba en el escritorio y luego volvió a escribir usando una pluma *ball point* verde con tapa plateada que le suministró el propio abogado. Mientras el acusado escribía oía un murmullo entre ambos pero no podía decir lo que se hablaba. (T.E. págs. 431–465)

Este documento, escrito allí por el acusado, identificado por el testigo Caraballo Pintor, se marcó *"Identificación L"*

---

(²) Aun cuando el Juez sentenciador hizo expresiones de que él y los demás jueces garantizaban a los acusados indigentes la entrevista confidencial con sus abogados de Asistencia Legal en las dependencias de la corte, lo cual no dudamos, los acusados no indigentes de ordinario bajo fianza tenían sus entrevistas en las oficinas de sus abogados contratados, según expresó el juez, el resultado del debate deja convencido que no existen facilidades físicas para estas entrevistas de abogado y cliente en el tribunal sin la inmediata presencia o de testigos o de taquígrafos, periodistas u otros funcionarios y empleados, como lo demuestran los hechos de este mismo caso.

del Pueblo y eventualmente se admitió en evidencia con la oposición del acusado. (³)

—3—

Terminada la declaración del testigo Mariano Caballero Pintor, el Fiscal Ramos Ortiz produjo la declaración del Fiscal Felipe Ortiz Ortiz. Manifestó el Fiscal Ortiz Ortiz haber sido el fiscal que investigó el caso. Era fiscal desde 1962 y antes había ejercido el cargo de juez de distrito durante varios años. Identificó la *"Identificación K"* del Pueblo como un documento que suscribió el acusado en presencia de la Juez Sra. Nilda Cortiella de Saavedra quien presidió la vista preliminar, en presencia de su abogado y del fiscal. Esta "Identificación K" es una copia al carbón del documento original *"Identificación Q"* admitido eventualmente en evidencia. (⁴)

Identificó el Fiscal Ortiz Ortiz los documentos M-1 y M-2, original y copia al carbón de un impreso mimeografiado solicitando rebaja de fianza, fechado 27 de mayo de 1965 y firmados su original y copia por el acusado José A. Llanos Guerra. Este documento tiene un sello de la Cárcel de Dis-

---

(³)"José A. Llanos Guerra—43710 Victor Llanos Guerra—Querido brother—Espero en Dios que al llegar estas humildes lineas a tus manos de halles gozando de todos tus deseos igual al viejo y demás Brother por fin he recibido carta de uds.

.    .    .    .    .    .    .    .

"Pa Batata oye batata dile a tu brother bicho grande que te halluden que yo estoy preso y sin sarvación. Pues tu brother me dijo que matara al hijo también y yo no le hice caso pues dile que te hallude si no yo hablo y lo acuso a el porque mientras yo mataba al viejo cabrón ese él me estava esperando dentro de la letrina fijate batata si yo hubiera cogido los consejos de tu hermano.—Victor Manuel (?) Colón—Box 545—Galera 404—Río Piedras, P.R.—José A. Llanos Guerra—Edificio #80 Apt. #1525 Caserío Luis Llorens Torres, Santurce, P.R."

(⁴)La *"Identificación Q"* es un impreso de declaración jurada en donde el acusado escribe de su puño y letra lo siguiente:

"Amparándome en mi derecho constitucional me niego a declarar por recomendación de mi abogado. (Fdo.) José A. Llanos Guerra. Jurada y suscrita ante mi hoy 7 de junio de 1965. (Fdo.) Felipe Ortiz Ortiz."

trito y está refrendado por un oficial de récord. Declaró el Fiscal Ortiz Ortiz que envió a la División de Documentos Dudosos de la Policía las *Identificaciones Q, M-1 y M-2* junto a la carta *"Identificación H"* que dijo haberla recibido del detective Pizarro. El resultado del estudio caligráfico del Laboratorio de la Policía sobre la carta *"Identificación H"* y los otros documentos sometidos fue negativo. Así lo comprobaron tanto el fiscal como el abogado de la defensa en la oficina del fiscal. El Fiscal Ortiz Ortiz le enseñó a la defensa la carta *"Identificación H"* y llegaron a cierto acuerdo en cuanto a dicho documento.

Se le mostró al testigo Fiscal Ortiz Ortiz la *"Identificación L"*. Esta es la escritura que el abogado defensor le tomó al acusado durante la entrevista en la oficina del alguacil a que se refirió el testigo Caballero Pintor y que este testigo, debido a su presencia inmediata, identificó. El fiscal dijo que esa *"Identificación L"* se la había entregado el Lcdo. Kolthoff. Identificó igualmente el Fiscal Ortiz Ortiz otro documento que fue marcado *"Identificación O"* del Pueblo y que describió como un documento que estaba unido o cosido con presillas a la *"Identificación L"* que le entregó el Lcdo. Kolthoff.

Declaró el Fiscal Ortiz Ortiz que llegó a un acuerdo con la defensa de someter al perito calígrafo de la policía las *"Identificaciones H, L, y O"* para un estudio, para ver si la letra de la persona que escribió la *"Identificación H"* correspondía a la letra de la persona que escribió las *"Identificaciones L y O"*. (T.E. págs. 479–480) Manifestó que el propósito era que si no era la misma letra la defensa usara el informe para su beneficio y si se determinaba que era la misma letra El Pueblo lo usara para el suyo. El informe en esta segunda ocasión fue positivo de identificación de las letras.

El Fiscal Ortiz Ortiz presentó una moción al tribunal sobre citación de testigos adicionales, incluyendo a la tes-

tigo Margarita Rodríguez quien produjo la *"Identificación H"* y al perito de la Policía Sr. Viñas, quien rindió el informe. Esta moción se radicó el 1ro. de septiembre de 1965. Manifestó el fiscal que él y la defensa hablaron en varias ocasiones sobre el informe de la prueba caligráfica, también en presencia de otras personas. Del récord transcribimos: (T.E. págs. 485 y 487)

"P Manifestó usted algo en ese día al Lic. Kolthoff o al Fiscal Dueño en presencia del Lic. Kolthoff?

R · [Fiscal Ortiz Ortiz] En varias ocasiones el colega había ido a mi oficina para que yo le devolviera el escrito que él me había dado, los dos escritos que él me había dado de las muestras del Sr. Llanos Guerra. Yo le había dicho, me había negado a devolvérselos. El insistía hasta llegar al punto que me dijo que yo tenía que devolvérselos en cualquier forma. Entonces yo le dije que así no, entonces . . .

P Que así no?

R Que así no se los podía devolver esos documentos, en cualquier forma, en términos amigables. Entonces él me dijo, 'pues yo voy donde haya que ir, porque esos documentos son del acusado, son privilegiados del acusado, y yo no estoy autorizado a entregarlos'. 'Pues vamos donde el Fiscal Dueño'. Yo le dije, antes de ir donde el Fiscal Dueño, las razones que él me dio la última vez para que yo se los devolviera fueron las siguientes, que ahora él no era el abogado solo en el caso, que los familiares del señor procesado estaban en planes de contratar o habían contratado, no me acuerdo muy bien, al Lic. Roberto de Jesús Cintrón, que ya la situación ahora había cambiado, porque él había hablado, el compañero Kolthoff con el Lic. de Jesús, y el Lic. de Jesús le había dicho que él, el Lic. Kolthoff, había sido muy ingenuo al darme a mí esos documentos, y que . . . , bueno, pues con ese cuadro fuimos donde el Fiscal Dueño, le planteamos, yo aconsejé al compañero que en vista de esa actitud de él que radicara una moción ante el Tribunal para que se dilucidara si esa ocupación que yo tenía de esos documentos era legal o ilegal. Bien, fuimos donde el Fiscal Dueño. . . .

HON. JUEZ:

En qué fecha fue eso?

R Después . . . , Sr. Juez, el día no recuerdo.

P Pero más o menos?

R Fue después que yo había recibido el resultado del análisis caligráfico, el último que hizo el perito Viñas, Sr. Juez.

P Que tiene fecha de agosto, 13 de agosto.

R Sí, Sr. Juez, el último.

P Como cuánto tiempo después, o sea, cuánto tiempo más o menos hace?

R Hace poco tiempo, Sr. Juez, yo francamente . . .

P Estamos a 23 de septiembre, y el informe tiene 13 de agosto, hace un mes y diez días del informe, vamos a ver más o menos cuánto tiempo después de esa fecha 13 de agosto más o menos.

R Pocos días después.

P Pocos días después?

R Sí, Sr. Juez, yo no apuntaba la fecha de nada de eso, de las entrevistas que hacía con el colega.

P Que no anotó números?

R Las fechas que yo celebraba con el colega, no, Sr. Juez.

HON. FISCAL:

Cuál fue el resultado de esa entrevista con el Hon. Fiscal Zoilo Dueño?

R Allí el Sr. abogado defensor expuso ante el Hon. Fiscal de Distrito las mismas razones que me había expuesto a mí; además abundó y expuso una razón adicional, que era que él estaba siendo entrevistado por el Hon. Juez Hiram Cancio para Oficial Jurídico, o algo así, y que eso le podía hacer daño. El Fiscal Dueño, después de oir mis argumentos y los de él, le dijo que lo más indicado era que él radicara una moción ante el Tribunal para que eso se dilucidara, y ahí terminó la entrevista."

### Contrainterrogatorio del Fiscal Ortiz Ortiz

El Fiscal Ortiz Ortiz fue sometido a un extenso contrainterrogatorio por parte del Lic. Kolthoff sobre hechos que el fiscal o negó o dijo no recordar que hubieran sucedido en las relaciones entre ellos como compañeros y como abogados en el proceso.

A la página 495 el Fiscal Ortiz Ortiz hace el siguiente relato en el récord:

"R Todo lo que el colega ha dicho sobre la conversación en relación con el caso ocurrió después que yo tuve la carta. Un día yo llamé al colega y le dije, 'Mira . .'—después que había venido el resultado ese negativo— . . 'aquí hay una carta. El fin del abogado—él me corrige si eso es verdad o no—es hacer verdadera justicia, no es ganar caso ni que absuelvan casos, como yo tengo esta carta y yo envié estos documentos y la prueba no es suficiente, vamos a someter estos documentos a análisis, tú hablas con el acusado'. El acusado, él me decía que el acusado decía que era inocente siempre, 'entonces habla con el acusado y si después que el acusado dé la muestra voluntariamente la analicemos y determinamos que esa no es la letra de él, nosotros vamos a hablar con este caso para aclarar y que se haga verdadera justicia', y le dije más, le dije, 'si aún sigues con el caso, yo a pesar de que este es un caso de asesinato en primer grado, estoy dispuesto a hablar para que lo bajen a segundo grado después si es que se sigue, porque yo dudo que después que con esta carta hagan un análisis negativo se siga con el caso.' Eso fue después de recibir la carta, ahí fue que se le hicieron las promesas y hablamos los dos, y él dijo, 'yo voy a hablar con el acusado', y entonces habló con el acusado y luego habló conmigo y dijo, 'el acusado insiste que él no ha escrito cartas', y le dije, 'toma la carta', me desprendí de la evidencia mía y se la dí al compañero Kolthoff; el compañero Kolthoff se la llevó . . .

HON. JUEZ:

R  El original de la carta?

R  Sí señor, me desprendí de ella, Sr. Juez.

P  La identificación H?

R  Sí señor, me desprendí de ella y se la dí a él, 'llévasela a él, muéstrasela al acusado a ver si el acusado dice que no, y si el acusado insiste que no es la letra, entonces me traes la muestra, si la letra esa no es la de él, pues entonces ya veremos qué se hará con este caso.' El compañero Torres González había venido a Sala y le había dicho al colega, porque el colega mismo me lo dijo, que sí, se estaba buscando una prueba, que sí se determinaba que esa prueba exoneraba al acusado, se iba a archivar el caso. Eso me lo dijo a mí.

HON. JUEZ:

El Lic. Kolthoff?

R Sí señor, el Lic. Kolthoff me lo dijo a mí, que el Lic. Kolthoff le pidió la suspensión, y me dijo eso, estaban buscando una prueba y si se consigue y exonera el acusado vamos a archivar el caso. Eso me lo dijo el Lic. Kolthoff. Esa es la situación.

HON. JUEZ:

Puede continuar el interrogatorio.

R Que dicho sea de paso, me recriminaron porque yo había entregado esa evidencia a los demás Fiscales, que me había desprendido de una pieza de evidencia y que se la había dado, que el acusado podía haberla roto y eso, esas cosas, que esas eran ignorancias mías, y yo dije que estoy actuando de buena fe y quiero que se haga justicia, por eso lo hice."

Aceptó el Fiscal Ortiz Ortiz que el acusado había firmado la *Identificación Q* a petición suya, en el Tribunal de Distrito pero que lo fue en presencia de la defensa y sin que el fiscal lo amenazara o le hiciera oferta alguna. Para el 14 de julio de 1965, fecha en que se señaló por primera vez el juicio de este caso, el fiscal aún no le había enseñado a la defensa la *"Identificación H"*. No recordó el fiscal si para esa fecha, 14 de julio, ya el calígrafo había rendido el informe sobre los documentos que le fueron sometidos. El informe tiene fecha 18 de julio. No recordó el fiscal si fue el 5 de agosto de 1965 después del primer señalamiento del caso para vista, que le enseñó a la defensa la carta *"Identificación H"*.

Aceptó que había pedido a la defensa que fuera a su oficina para hablar sobre dicha carta. (T.E. pág. 508)

[Fiscal Ortiz Ortiz]: "Yo sé que yo invité, fui en busca del colega para hablar sobre esta carta, no se si se la mostré expresamente en su oficina o si fuimos a mi oficina, yo sé que fue el colega a mi oficina y hablé sobre el contenido de la carta, no sé si fue ese día.

.     .     .     .     .     .     .     .     .

DEFENSA:

Puede el distinguido compañero decirle a este Tribunal si ese día 5 de agosto este servidor se presentó a su oficina a petición de él, por la mañana antes de empezar la vista del caso?

HON. FISCAL:

A petición de quién?

DEFENSA:

A petición de este servidor, si él fue a buscarlo a mi oficina y pidió que quería hablarme confidencialmente.

R Yo sé que ocurrió, ahora, no sé si fue ese día.

P Quiere tener la bondad el distinguido compañero de decirle a este Tribunal si en esa ocasión en que yo visité a su oficina a petición de él, del distinguido compañero, si el Hon. Fiscal Felipe Ortiz le manifestó que se había descubierto recientemente una carta sumamente incriminatoria, que él me quería mostrar, porque él conociendo que ambos representábamos la justicia y que queríamos que se hiciera justicia, él quería que yo la viera, se la mostrara al señor acusado, con el propósito de que si él admitía que esa carta era cierta, él estaba dispuesto a ofrecerle previo un 'plea', una alegación de culpabilidad de él, rebajarle el delito de asesinato a asesinato en segundo grado?

R Yo quiero decirle al, que es cierto que yo en una ocasión, no sé si fue ese día que dice el colega, llamé al colega y le indiqué de la existencia de esa carta que era incriminatoria, y que es cierto que le dije al colega que tanto a él como a mi nos debía animar el propósito de que se hiciera verdadera justicia, y que yo quería mostrarle la carta, la que se la iba a entregar al colega para que hiciera, se la mostrara al acusado, y se la en, [sic] entonces me desprendí de ella y se la entregué para que el acusado la viera y que después si el acusado quería dar voluntariamente muestras para compararla y que luego de eso si se determinaba que el resultado era positivo yo la podía utilizar y que si era negativa él la podía usar, y que yo bregaría con eso con el Fiscal del Distrito y que además que si continuaba el caso, si se decidía continuar el caso, yo estaría dispuesto a hablar con el Fiscal de Distrito para que le rebajaran el caso a segundo grado.

HON. JUEZ:

Bien.

DEFENSA:

El Hon. Compañero Fiscal le quiere decir a este Tribunal que ese día en esa entrevista él le pidió a este servidor, hizo un trato con él para que le trajeran muestras de la escritura del acusado?

R  Oh, no, no, trato no, que se lleve la carta, que se le sometiera al señor acusado para que la conociera y si después que él la viera quería dar muestras, que las diera, creo que fue así.

P  Cree que fue así?

HON. FISCAL:

Que lo deje terminar.

HON. JUEZ:

Terminó?

R  Ese es el mejor recuerdo.

DEFENSA:

Sr. Ortiz, dígame específicamente si lo recuerda, si la conversación ese día se limitó a usted pedirle a este servidor que le mostrara dicha carta al Sr. Llanos Guerra y que si él admitía su autenticidad usted estaba dispuesto a darle un segundo grado?

R  Ah, no, yo estaba dispuesto a interceder con el Fiscal para que le diera el segundo grado; siempre estuve dispuesto hasta antes de comenzar este juicio por otras consideraciones, pero también yo quería que se buscara la muestra de la carta para que si era una tercera persona, yo quería satisfacer mi conciencia, porque lo que me animaba a mí era el propósito de hacer justicia, dormir tranquilo, que un inocente no fuera a la cárcel. Yo iba a bregar con el Fiscal del Distrito, pero si a pesar de eso el Fiscal del Distrito no quería por alguna razón en vista de la otra prueba, yo estaría dispuesto a que, a hacer las gestiones para que se hiciera un segundo grado; digo, a recomendar eso.

P  Entonces le pregunto yo al distinguido compañero si su aseveración bajo juramento a este Tribunal es que en esa ocasión él le manifestó a este servidor que interesaba muestras de la escritura del acusado para compararla con la carta?

R  Yo creo que sí.

.     .     .     .     .     .     .     .

P  Recuerda el distinguido compañero, y si lo recuerda, si lo puede decir a este Hon. Tribunal, si es o no es cierto que una vez entrevistado este servidor con el acusado me dirigí a él nuevamente y le manifesté que el acusado negaba por completo el contenido de la carta y que por tanto le agradecía mucho su ofrecimiento de un segundo grado, porque no lo aceptaba?

R  En qué ocasión?

P  El mismo día como a eso de las diez y media de la mañana de ese día 5 que hablo.

R  Bueno, en ese día yo no recuerdo si me lo dijo, yo sé que siempre el colega me ha dicho a mí que el acusado no acepta el segundo grado, todas las veces que se ha referido a ese punto siempre me ha dicho que, lo mismo, que no acepta el segundo grado, eso es correcto, sí; en algunas ocasiones me ha dicho eso, siempre me ha dicho lo mismo.

P  Recuerda el distinguido compañero si más entrada la mañana de ese mismo día, este servidor se dirigió a él y le dijo las siguientes palabras, 'Felipe, yo intereso ver nuevamente esa carta, si tú me la prestas', ¿recuerda eso el compañero?

R  Ese, ese detalle específico no lo recuerdo.

P  Recuerda el distinguido compañero si él me contestó que sí me la prestaba porque él confiaba en mí y que siguiera haciendo gestiones cerca de Llanos Guerra para ver si él quería un segundo grado a cambio de un 'plea', es decir, a cambio de una declaración de culpabilidad?

R  Yo no recuerdo el detalle específico, pero lo que siempre le he dicho al colega es que siempre he confiado en él, es cierto, y lo de segundo grado, todas las veces que he hablado con el compañero se lo he dicho, por otras razones que no creo. . . .

Aceptó el Fiscal Ortiz Ortiz que el Lcdo. Kolthoff le devolvió la carta y que días más tarde hablaron él y la defensa sobre peritos calígrafos de la Policía de Puerto Rico y del F.B.I. Después de un prolongado interrogatorio sobre hechos alegadamente ocurridos entre abogado defensor y fiscal a los cuales el Fiscal Ortiz Ortiz declaró que no recordaba, manifestó el Fiscal Ortiz Ortiz: (T.E. pág. 523)

"P  Recuerda el distinguido compañero si yo en ese momento le hice entrega debidamente doblado de unos papeles para que se los entregara al Sr. Viñas?

R  [Fiscal Ortiz Ortiz] Yo no, yo sé que el colega me entregó unos documentos a mí, yo no sé si fue ese día, sé que me entregó unos documentos que están ahí, que se identificó por el Pueblo; no fue en las condiciones ni en la forma que dice el colega.

P  Recuerda el distinguido compañero si él le hizo entrega de esos documentos al Sr. Viñas?

R Yo creo que sí, sí. Digo, los documentos estos que me entregó el colega a mí.

P Y puede decirle el compañero a este Hon. Tribunal si él le dijo al Sr. Viñas de quién procedían y cuál era el propósito de esos documentos?

R Yo le dije lo que yo quería que él hiciera con esos documentos.

P Lo que usted quería que hiciera con esos documentos?

R Que los analizara, que comparara la carta a ver si era la misma persona, eso fue lo que yo le dije."

Después de contestar que no recordaba sobre otros hechos, expresó el Fiscal Ortiz Ortiz: (T.E. págs. 528-529)

"R Esos dos que tiene el colega; yo lo que sé es que, Sr. Juez, tan pronto el colega se enteró por algún medio y fue a mi oficina y yo le indiqué que iba a utilizar eso, él me dijo que yo tenía que devolverle eso, porque eso era privilegiado del acusado y que el acusado no lo había autorizado a él a entregarme esos documentos a mí y que yo tenía que entregárselos, y fue en varias ocasiones y a lo último fue que me dijo aquello de que tenía que entregárselos de cualquier manera. Siempre insistía el compañero que eso era privilegiado y que el acusado no lo había autorizado a él, siempre insistía en eso, es correcto, Sr. Juez, en cuanto a esos dos.

DEFENSA:

P Dígame el distinguido compañero si en esa ocasión a que yo me referí anteriormente en mi pregunta, el día primero de septiembre, si él me devolvió esos documentos?

R Yo?

P Sí.

R No, yo me negué a devolvérselos a usted.

P Dígame el distinguido compañero si estas fueron mis palabras, 'Felipe, tú te das cuenta de lo que tú quieres hacer?'

R Yo el recuerdo que tengo no es ese. ¿Quiere que le diga?

HON. JUEZ:

Adelante.

DEFENSA:

Recuerda si yo seguí diciéndole al compañero, 'Felipe, tú estás bromeando'?

R No recuerdo, no recuerdo eso. Si el colega quiere que le . . .

HON. JUEZ:

Cómo es?

R Si el colega quiere que le diga, el recuerdo . . .

P Qué es lo que recuerda.

R El colega me dijo en esa ocasión que yo no podía usar esos documentos porque esos documentos eran privativos, el acusado no los había dado para que se usaran, y que cuando él me los entregó a mí no me los entregó con la intención de que yo los usara en contra del acusado en un juicio."

Continúa declarando el fiscal: (T.E. págs. 530–531)

"P Dígame el distinguido compañero, dígale al distinguido Tribunal, si en repetidas ocasiones yo fui a hablar con él para que me devolviera el documento?

R Eso es muy correcto, Sr. Juez.

P Dígame el distinguido compañero si en esas ocasiones yo le informé a él, o le hice saber, que ese documento cuando yo se lo entregué a él para que se lo llevara al Sr. Viñas, lo hacía confiando en su caballerosidad en la forma que él había confiado en mí cuando me entregó la carta que supuestamente Llanos Guerra había escrito.

R Me lo dijo, Sr. Juez, en la última ocasión, así mismo, en esas palabras.

P Y recuerda el distinguido compañero si yo le dije que me extrañaba mucho que él se comportase en esa forma?

R Eso yo no lo recuerdo que lo dijera.

P Recuerda el distinguido compañero si yo le dije específicamente que yo creía que eso no era de caballeros?

R No, eso no me lo dijo, Sr. Juez.

P Recuerda el distinguido . . .

R Digo, no me lo dijo en mi oficina.

HON. JUEZ:

Adelante.

DEFENSA:

Recuerda el distinguido compañero si yo le dije que él estaba faltando a su compañerismo?

R Eso no recuerdo, Sr. Juez, que me lo haya dicho.

P Recuerda el distinguido compañero si él me dijo que él comprendía mi situación, pero que esa era la única prueba que

tenía verdaderamente el Pueblo, y que no me la iba a dar?

R Eso es extremadamente falso, Sr. Juez.

P Dígame el distinguido compañero si en esa ocasión yo le dije que él me lo tenía que dar de todas formas?

R Lo de todas formas me lo dijo en la última ocasión, yo no sé si fue en esa; o sea, que fue cuando fuimos donde el Sr. Zoilo Dueño González, no sé si fue en esa vez.

P Dígame el distinguido compañero si él sé echó hacia atrás en la silla y lo tomó a bromas y dijo, 'no, de todas formas no'.

R Yo no tomé a bromas, porque yo nunca tomo las cosas a broma, y menos esta cuestión jurídica; le dije que en esa forma no.

P Dígame el distinguido compañero si él recuerda ayer haber dicho en este Tribunal—ayer no, esta mañana—, que cuando yo, él lo hacía en broma?

R No señor, en broma yo no.

.     .     .     .     .     .     .     .

P Recuerda el distinguido compañero que subsiguientemente por la tarde de ese mismo día me encontré con el compañero en el pasillo y le pregunté si me iba o no me iba a dar los documentos?

R Yo no recuerdo eso, yo sé que el colega insistió en muchas y muchas y muchas ocasiones que yo le devolviera esos documentos.

P Dígame el distinguido compañero si él no me dijo que comprendiera su situación, que él no me los podía entregar, pero que si el señor Zoilo Dueño lo autorizaba que entonces él me hacía entrega de los documentos?

R Si ya habíamos ido donde el Fiscal Dueño, no señor.

P Recuerda el distinguido compañero si yo le manifesté en esa fecha que todas las transacciones habían sido en acuerdo de caballeros entre él y yo, en lo cual su supervisor Zoilo Dueño no tenía que intervenir?

R Eso no lo recuerdo, lo de la transacción de caballeros; sí me lo había dicho ya antes, antes de ir a la oficina del Fiscal Dueño."

Aceptó el fiscal conocer al Sr. José Antonio Pagán como una de las personas que estuvieron presentes el día que discutieron con el Fiscal Dueño sobre la devolución de los docu-

mentos. Que la defensa le expuso la situación al Fiscal Dueño y que en la entrevista el testigo dijo allí lo siguiente: (T.E. pág. 536)

"R [Fiscal Ortiz Ortiz] Mi contención fue que el documento a que se ha estado refiriendo el letrado de la Defensa había sido sometido al examen pericial para que él lo utilizara si le era beneficioso, y para yo utilizarlo, o sea, el Pueblo de Puerto Rico utilizarlo si le era beneficioso. Esa era mi contención. La contención del colega era que él me lo había entregado a mí no con intención de desprenderse de él, porque no estaba autorizado por el acusado, porque era privilegiado, y que yo no lo podía usar y que yo estaba mal interpretando, que solamente se me dio para determinar única y exclusivamente si era la muestra de letra, esa fue siempre la contención que el colega tuvo. Desde luego, usó otro argumento que ya yo dije que no creo que deba referirse ahora.

.     .     .     .     .     .     .     .

P Diga el distinguido compañero si este servidor no le replicó a don Zoilo que no había por qué darle ingerencia al Tribunal en algo que era completamente confidencial, que había sido obtenido sin el consentimiento de este servidor, que se pretendía usar ilegalmente, que nosotros no queríamos darle ingerencia al Tribunal porque no había por qué hacerlo y que no lo íbamos a hacer?

R Yo no conozco, no recuerdo las palabras exactas, pero yo sé que a esa indicación del Hon. Fiscal el letrado de la Defensa mantuvo su posición que siempre había mantenido de que ese documento era privilegiado, que el acusado no lo había autorizado a él a divulgarlo y que se lo entregó al Fiscal Ortiz Ortiz, este que declara, no con la intención de que yo lo usara." (T.E. pág. 537)

Dijo el Fiscal Ortiz Ortiz no recordar si el 10 de septiembre como resultado del informe le pidió a la defensa que hiciera gestiones cerca del acusado para que aceptara un segundo grado pero aceptó que siempre estuvo en actitud de hacer gestiones para ver si la persona autorizada admitía que se le rebajara la calificación del delito pero no por la cues-

tión de los documentos, sino por otras razones. (T.E. págs. 540–542)

"DEFENSA:

Dígame el distinguido compañero si sabe, si yo hice gestiones con el Sr. Llanos Guerra?

R [Fiscal Ortiz Ortiz] No recuerdo si las hizo, lo que sí puedo decir es que el colega todas las veces que me dijo que había hablado con el señor acusado éste se negaba a aceptar de que, declararse culpable del delito de asesinato en segundo grado, eso me lo dijo el colega a mi siempre.

P Dígame el distinguido compañero si yo le manifesté que como resultado de las gestiones el Sr. Llanos Guerra insistía en que él era inocente y que no hacía ninguna alegación de culpabilidad?

R En todas las ocasiones que el colega habló conmigo me dijo lo mismo, que el señor insistía en eso.

P Dígame finalmente el Sr. Ortiz si hasta el día martes 21 de septiembre este servidor ha seguido insistiendo con él que dichos documentos eran confidenciales, que dichos, que el compañero había faltado a su caballerosidad al no querérmelos entregar, que los había obtenido ilegalmente, sin el consentimiento de este servidor, y que insistía que me los devolviera?

R Lo de las imputaciones de falta de caballerosidad me las hizo el señor letrado de la Defensa en la tarde de ayer en la oficina del Hon. Juez Guillermo A. Gil; en cuanto a las otras cosas, es verdad que el colega siempre ha insistido en todas las ocasiones en que esos documentos son confidenciales y que él no me los entregó para que yo los utilizara, y que el acusado no lo autorizó a él a divulgar eso.

P Dígame el distinguido compañero entonces si en alguna ocasión él protestó ante este servidor diciéndome que nosotros teníamos un trato sobre esos documentos?

R Ahí yo le expliqué al colega en repetidas y múltiples ocasiones cuál era la situación según yo la había entendido, que la situación según yo la había entendido era que de, que se sometieron los exámenes a peritos calígrafos para si el resultado que se obtuviera, la parte que le fuera beneficioso lo utilizaría, pero a esto el colega decía que no, que no podía ser así porque él, esos documentos eran privilegiados, que el acusado no lo auto-

rizó a él, que él no me los dio con la intención que yo los utilizara y que yo estaba impedido de utilizarlos y que yo lo había interpretado mal a él.

. P Dígame el distinguido compañero si recuerda la fecha en que él y yo hicimos ese entendido de someterse a un perito calígrafo los documentos.

R Colega, yo no apunté ninguna fecha, no pensaba que esto pudiera llegar a este plano, no se nada, no recuerdo la fecha, porque yo no estaba tramando un plan con intención de engañar al colega ni beneficiarme en nada, lo que recuerdo, Sr. Juez, es la espina dorsal de la cosa, para qué fue."

—4—

En relación con este incidente, y terminado el testimonio del Fiscal Ortiz Ortiz, declaró el Sr. José Antonio Pagán que para la fecha era estudiante del Colegio de Derecho de la Universidad de Puerto Rico y estaba adscrito a la Defensa Legal de San Juan como parte de su clínica de estudio. Declaró haber estado presente en la entrevista entre la defensa, el Fiscal Ortiz Ortiz y el Fiscal Zoilo Dueño anteriormente relatada. La posición de la defensa fue en el sentido de que debían devolvérsele esos documentos porque eran confidenciales y privativos del acusado; que el fiscal manifestó que comprendía la posición de la defensa pero que esa era la única prueba que él tenía y no se la iba a dar; que precisamente en esa evidencia descansaba la prueba del Pueblo y se caía el caso; el Fiscal Zoilo Dueño decidió que él creía que no se debía entregar el documento; que si acaso el Lcdo. Kolthoff hiciera una moción al tribunal porque esa era la prueba del Pueblo; que el Lcdo. Kolthoff le explicó al Fiscal Dueño que le había prestado un documento al Fiscal Ortiz Ortiz para que se lo entregara al calígrafo y el fiscal se negaba a devolvérselo y que el Fiscal Dueño decidió que no se le debía devolver porque ya esa era prueba del Pueblo. El documento no fue entregado.

(T.E. pág. 555)

"DEFENSA:

Tenga la bondad el distinguido testigo de decirle a este Tribunal con lujo de detalles todo lo que oía, las palabras vertidas entre una y otra parte ese día en la oficina del Fiscal Zoilo Dueño, hasta donde recuerde el compañero?

R Se procedió a relatar cómo había llegado a manos del Fiscal el documento en cuestión.

HON. JUEZ:

Quién relató?

R Estaba relatando el compañero Kolthoff, el Lic. Kolthoff, y expresó, le expresó al Fiscal Zoilo Dueño que él le había entregado el documento al Fiscal con el mero propósito de que pasara a manos del calígrafo, ya que en Puerto Rico no había otro y los disponibles eran de los de la Policía, y que el Fiscal se había ofrecido a entregárselo al de la Policía. Entonces al explicarle el asunto al Fiscal Zoilo Dueño, este insistió en que no se le podía entregar el documento, que si quería que lo hiciera a través de que hiciera el pedido a través de una moción al Tribunal."

—5—

El abogado de la Defensa Lcdo. Erick Kolthoff ocupó la silla de testigos en cuanto a este incidente. Declaró sobre todos aquellos extremos en relación con los cuales había repreguntado al Fiscal Ortiz Ortiz y éste manifestó no recordarse o no haber ocurrido los hechos en la forma en que se preguntaba. Dijo (T.E. pág. 564) que en 7 de junio, fecha en que se celebraba la vista preliminar, el Fiscal Ortiz Ortiz se le acercó en la mañana y le expresó su preocupación porque la Fiscalía exigía el requisito de que toda persona a quien él entrevistara y se negara a declarar firmara un papel diciendo que se negaba a declarar; que no había conseguido en el caso de este acusado Llanos Guerra esa aseveración por escrito y eso le causaría perjuicio con su supervisor el Fiscal Zoilo Dueño; y le pidió encarecidamente que como compañero le ayudara a obtener esa declaración y que ello en forma alguna perjudicaría al acusado. La defensa desconocía que para esa fecha, 7 de junio de 1965, el fiscal

ya tuviera en su poder la carta *Identificación H* que se suponía había escrito Llanos Guerra. El testigo no tuvo objeción y en esa forma el acusado produjo él mismo la escritura *Identificación Q* del Pueblo. (⁵)

Siguió declarando el Lcdo. Kolthoff que posteriormente a eso el Fiscal Roberto Torres González le dijo que ellos estaban siguiendo una pista el resultado de la cual pudiera traer la exoneración del acusado y le pidió se allanara a la suspensión del caso.

La defensa se allanó y el caso se señaló nuevamente para el 5 de agosto. El Fiscal Torres González no le informó en qué consistía esa pista que ellos estaban siguiendo, ni que hacía ya más de un mes que la misma estaba en posesión de ellos, ni que buscaban la forma de conectar la carta *Identificación H* con el acusado Llanos Guerra. Que en la mañana del 5 de agosto de 1965, fecha del segundo señalamiento, el Fiscal Ortiz Ortiz pidió al testigo que lo acompañara a su oficina porque tenía un documento muy importante que le quería enseñar; que allí le mostró la *Identificación H* del Pueblo, carta supuestamente escrita por el acusado Llanos Guerra. El fiscal le dejó la carta para que el abogado hiciera gestiones con el acusado para que éste, después de verla, decidiera si admitía una alegación o aceptaba la culpabilidad de un delito menor, específicamente un asesinato en segundo grado. El abogado le manifestó que eso era una sorpresa. Que su cliente siempre le decía que él era inocente y le agradeció al fiscal que le enseñara el documento. Le advirtió el fiscal que el documento era confidencial; que tratase de que nadie se enterara porque a él le podía ir mal como fiscal

---

(⁵) De ser correcto que era una norma de la Fiscalía el exigir a un acusado la declaración *por escrito* de que no quería declarar, la norma no respondía a la garantía constitucional contra la autoincriminación, ya que esa expresión en sí misma constituye una declaración. En efecto, en este caso fue una declaración escrita que se usó por el fiscal para comparar la escritura del acusado con la *Identificación H,* un documento sumamente incriminatorio.

si se enteraban que él le había enseñado ese documento a la defensa y que lo hacía porque confiaba en la caballerosidad del testigo.

El testigo consideró la posibilidad de que de ser ello cierto el acusado tratara de destruir la *Identificación H* y quiso asegurarse contra el riesgo informándoselo al alguacil y a su supervisor. El fiscal le autorizó a enseñarle el documento también al padre del acusado, porque este señor varias veces se había dirigido al Fiscal Aponte y al Secretario de Justicia insistiendo en que se hiciera otra investigación del caso porque aquélla estaba mal hecha. El abogado explicó lo sucedido a su Supervisor en Asistencia Legal y éste le autorizó a seguir adelante, pero le sugirió que obtuviera protección del Alguacil Rodríguez y así lo hizo. Al Sr. Llanos Guerra se le permitió salir bajo custodia y allí el testigo habló con su defendido. Le enseñó la carta y el acusado la negó por completo. Le habló del ofrecimiento del Fiscal Ortiz Ortiz de darle un segundo grado si él hacía esa alegación y el acusado se negó a hacerla porque él era inocente y no había escrito esa carta. El testigo le dijo que había querido informarle esa situación y que se lo expresaría a su padre, como lo hizo. Le mostró la carta *Identificación H* al padre del acusado. Este protestó la carta y manifestó que su hijo era inocente y ofreció voluntariamente darle copia al abogado de la escritura de su hijo, lo cual hizo. Le dio una carta escrita por Llanos a un hermano.(⁶)

Continuó declarando el Lcdo. Kolthoff que habló con el Fiscal Ortiz Ortiz antes de entrar a juicio y le explicó que su cliente seguía negando por completo que dicha carta fuera auténtica; que insistía en su inocencia y que por lo tanto la defensa le agradecía al fiscal la oferta de un segundo grado

---

(⁶) Esta carta que voluntariamente el padre del acusado puso en manos del abogado defensor es la *Identificación O* cosida con presilla a la *Identificación L* que la defensa entregó al Fiscal Ortiz Ortiz para un examen caligráfico de la Policía.

de hacerse tal alegación, porque "aunque hubieran 25 cartas como esa, que fueran auténticas si es que lo eran, o hubieran veinticinco mil pruebas más en contra de mi defendido, bastaba que mi defendido pues insistiese en su inocencia para yo defenderlo hasta lo último." En ese momento le devolvió al fiscal la carta *Identificación H*. (T.E. págs. 571–572)

La vista del 5 de agosto volvió a suspenderse a pedido de la defensa por razón del testimonio de un testigo señalado por el acusado que parecía ser vital, y el caso se señaló para el 21 de septiembre. El acusado le manifestó al testigo su preocupación porque creía que éste estaba dando crédito a la referida carta y le dijo que podía demostrarle que él no la había escrito. Para convencerlo de que no la había escrito el acusado se ofreció a escribirle algo para que su abogado se convenciera. Ante estos hechos la defensa pidió prestado al fiscal la carta *Identificación H*, y entonces ocurrió el incidente ya relatado por el testigo Caballero Pintor en donde se produjo la *Identificación L*, en la oficina del Alguacil del Tribunal Superior. El testigo le ofreció una página de su libreta y le indicaba al acusado lo que debía escribir. Después le dijo que le dejara un espacio en blanco y le ofreció su pluma y le siguió dictando. Habían presentes allí otras personas, entre ellas, guardias penales y el testigo Caballero Pintor. Al comparar el testigo la *Identificación L* halló disimilitud en la letra y le hizo pensar en la inocencia de su defendido. Trató de hacer una comprobación pericial caligráfica con el F.B.I. lo cual no le era posible a menos que pagara los gastos de un perito que trajeran de Estados Unidos. La Asistencia Legal no podía pagar tales gastos y desistió de la idea. Otros compañeros le manifestaron que el único calígrafo que conocían era el de la Policía. Transcurridos varios días habló con el Fiscal Ortiz Ortiz sobre la posibilidad de usar los peritos calígrafos de la Policía y el riesgo de hacerlo. El fiscal le insinuó que él podía usarlos sin peligro y que le rindieran el informe a él para su uso

personal. Que no había prohibición a que un perito que trabajara para la Policía examinara el documento de un abogado en relación con su cliente y le rindiera un informe sin intervención de la Fiscalía. (T.E. pág. 575)

Declaró el Lcdo. Kolthoff que el fiscal se ofreció a ayudarle a hacer contacto con el perito Viñas de la Policía y que en efecto dicho contacto fue hecho y en definitiva él le entregó al Fiscal Ortiz Ortiz las *Identificaciones L y O* para que éste se las entregara al perito Viñas.

Después de estos hechos, el 1ro. de septiembre, se enteró el abogado de la moción del fiscal solicitando adicionar testigos, entre ellos, el guardia penal Mariano Caballero Pintor y el perito Viñas. Esto lo alarmó y fue a Fiscalía. Le preguntó al Fiscal Ortiz Ortiz sobre la razón de citar a Caballero Pintor y al perito calígrafo y le preguntó si eso incluía los documentos que él le había entregado. A esto contestó el Fiscal Ortiz Ortiz que sí, que los iba a usar. El abogado protestó que esos documentos no eran del fiscal; que no se los había entregado a él sino como intermediario para que llegaran a manos del perito Viñas. Que el Fiscal Ortiz Ortiz le dijo que lo sabía pero que esa era la única prueba que él tenía porque con el otro testigo no podían contar y él no le iba a dar esos documentos. Que no estaba bromeando. La negativa del fiscal a devolverle esos documentos fue absoluta y la repitió en distintas ocasiones en que la defensa trató el asunto. Acordaron finalmente llevar la cuestión al Fiscal Zoilo Dueño. Que fue después que oyó declarar en corte al detective Pizarro el día anterior que se dio cuenta que el Fiscal Ortiz tenía la *Identificación H* desde el día 29 de mayo, o sea antes del 7 de junio en que pidió su cooperación para que el acusado firmara la declaración que constituye la *Identificación Q*. Siguió relatando el testigo en detalle todas las gestiones que hizo para obtener la devolución de los documentos, la cual resultó infructuosa, inclusive con

la intervención del Fiscal Dueño. El Fiscal Dueño sostuvo igualmente que lo sentían pero que no podían devolverle el documento y le sugirió que sometiera una moción al tribunal. El testigo le dijo que no había por qué darle ingerencia al tribunal ya que ésta había sido una transacción privada y confidencial entre los abogados dentro de la confianza y caballerosidad que existía entre ellos. Nunca le devolvieron esos documentos.

Declaró el Lcdo. Kolthoff que comprendiendo el alcance de la situación y lo desagradable que era, insistió siempre en que se resolviera sin que traspasara al público (T.E. pág. 584); que trató de hablar en cámara con el juez, habló con otros compañeros de la Fiscalía, y con otros abogados.

Contrainterrogado el Lcdo. Kolthoff por el Fiscal Ramos sobre si el Lcdo. Roberto de Jesús le había dicho que fue ingenuo al hacer público un documento que pertenecía a su cliente, contestó el testigo que el Lcdo. de Jesús le había manifestado que había sido sumamente. . . . (T.E. pág. 593) El Lcdo. de Jesús era amigo del padre del acusado.

Lo escrito por el acusado en la *Identificación Q* (declaración de que no declaraba) fue dictado también al acusado por el testigo. Reafirmó a preguntas del Fiscal Ramos que su único propósito al dictarle al acusado que escribiera del mismo texto de la *Identificación H* y entregarle el documento al fiscal fue sólo para que el perito pudiera constatar la veracidad de lo que su cliente le manifestaba, lo cual consideraba esencial para la mejor defensa. Que tuvo la primera sorpresa de lo que iba a ocurrir con esa prueba el 1ro. de septiembre cuando le llegó la moción del Fiscal Ortiz Ortiz citando esos testigos adicionales que incluían al perito calígrafo y al guardia penal. Ahí descubrió que el fiscal tenía la intención de utilizar esos documentos que no le pertenecían, privativos del acusado, y desde ahí empezó a insistir en que le fueran devueltos.

El fiscal no lo atropelló, o intimidó, pero trató de obtener los documentos ganándose la confianza del testigo como compañero.

Aseveró que nunca le dijo al acusado, ni fue nunca su intención hacerlo, que él, como su abogado, le iba a entregar esos documentos al fiscal. El calígrafo nunca le rindió informe a él sobre el resultado del examen de los mismos.

—6—

Ante esos hechos que revela el récord, el Tribunal Superior admitió, y permitió que las *Identificaciones L y O* pasaran al jurado, así como el testimonio del perito calígrafo de la Policía, Sr. Viñas, y el testimonio del guardia penal Sr. Caballero Pintor, en relación con los mismos.

Expresó la Sala que los documentos L y O no habían sido ocupados ilegalmente, por el Ministerio Público, sino que éste vino en posesión de ellos por entrega que le hiciera el abogado de la defensa. En cuanto al privilegio, concluyó la Sala que habiendo la defensa divulgado los documentos, dejaron de ser comunicaciones privilegiadas. (T.E. págs. 603–605)

Ante los hechos en el récord, la determinación de la Sala de instancia presenta muy serias consideraciones en la administración de la justicia criminal en Puerto Rico.

En tanto el Ministerio Público no hurtó de la defensa estos documentos, ni los obtuvo mediante el uso de fuerza y violencia, convengo con la Sala sentenciadora en que los mismos no llegaron a poder del Ministerio Público en forma *ilegal*.

Fue errónea también su conclusión sobre la pérdida del privilegio por su divulgación. En este caso el privilegio de la comunicación protegía al acusado, y nadie, su abogado defensor inclusive, podía divulgarla *sin su consentimiento*.

No obstante lo dicho, aquí estaba envuelta una situación más seria que la que presenta un problema técnico de evidencia sobre divulgación de comunicaciones privilegiadas.

Estaba y está aquí envuelta: (1) la básica garantía constitucional que protege a un acusado contra la autoincriminación, y (2) la otra básica garantía constitucional que asegura a un acusado un proceso *limpio*, justo e imparcial.

Al llegar a mis conclusiones me baso exclusivamente en los hechos que surgen del récord según la versión de los mismos dada por el Ministerio Público, en todo aquello en que la versión de uno y otro abogado apareciere contradictoria.

Ante los hechos en el récord, mi propio sentido de equidad me obliga a hacer las siguientes expresiones que creo necesarias en justicia a la responsabilidad profesional del abogado defensor.

Cualquiera que fuera el error inicial de este abogado, su inexperiencia o ingenuidad al poner a su defendido a confeccionar la *Identificación L* ignorando el acusado los propósitos que había detrás de ello, aunque tales propósitos fueran encaminados a resolver el abogado sus propias dudas en cuanto a la culpabilidad de su defendido ante las protestas de éste de su inocencia y su negativa a aceptar alegación de culpabilidad de un delito menor; cualquiera que fuera el error inicial, la inexperiencia o la ingenuidad del abogado defensor al poner este documento, junto con la *Identificación O* que fue la escritura suministrada a la defensa por el padre del acusado, en manos del Ministerio Público y de las autoridades policíacas, sin advertirle al acusado que haría tal cosa, el hecho final indisputado en el récord es que tan pronto el abogado defensor se dio cuenta de las consecuencias fatales que podrían acarrear sus actos al ser notificado de la moción del Ministerio Público citando testigos adicionales, los testigos Sr. Caballero Pintor y el perito de la Policía Sr. Viñas, el abogado inició una lucha denodada pero infructuosa, patética a juzgar por lo que refleja la totalidad del récord, en adición a las partes transcritas, para obtener del Ministerio Público la devolución de esa prueba en un deses-

perado esfuerzo por proteger a su defendido, cuando todavía el daño no se había consumado.

En el curso del proceso, cuando todavía el daño no se había consumado, el abogado defensor luchó tenazmente en un debate de dos días (T.E. págs. 389–602), oponiéndose a que esa prueba pasara al jurado.

En justicia al abogado defensor, era preciso hacer este deslinde de responsabilidades profesionales.

Era una prueba sumamente dañina que llevó al acusado a su convicción. Fueron las *Identificaciones L y O* las que permitieron identificar al acusado con la carta incriminatoria *Identificación H* cuando habían fracasado pruebas de caligrafía con otros documentos.[7]

Al permitir el tribunal de instancia que en las circunstancias que señala el récord el Ministerio Público hiciera uso de dicha prueba y ésta pasara al jurado, se violó la garantía constitucional del acusado contra la autoincriminación, se le negó un juicio limpio, imparcial y justo y se le dejó en una completa indefensión ante el hecho de haber entregado su propio defensor esa evidencia al Ministerio Público.

Quedó lastimada, con fatales consecuencias, esa relación de confianza plena que lleva a un acusado a abrirle su corazón y su mente a su defensor sin temor alguno, relación de confianza de la cual no puede prescindirse en la administración de la justicia criminal.

Disiento. Esta apelación envuelve mucho más que la manera en que un juez sentenciador dirimió un conflicto de credibilidad en cuanto a cómo unos documentos llegaron a manos del Ministerio Público. Según he expresado, están aquí presentes la violación del derecho constitucional a no autoincriminarse, la negación de un juicio *limpio* y la disolución del principio que inspira la relación de confianza entre el acusado y su defensor.

---

[7] Procede observar que al acusado se le dictó para que escribiera la *Identificación L,* parte de la carta *Identificación H* y de la *Identificación O.*

El caso, a mi entender, es más grave que el de aquellas diversas situaciones en que el Tribunal Supremo de los Estados Unidos ha dictaminado la ausencia de un debido procedimiento de ley y de un juicio imparcial y justo por actuaciones del Ministerio Fiscal.

Yo dispondría la concesión de un nuevo juicio.